# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| EASOON USA, LLC ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> BRETT KELLY; ) <br> MARK CLIFTON; and ) <br> DAVID S. OSTERMAN, a/k/a ) <br> STEVE OSTERMAN ) <br><br><br> Defendants. ) | Civil Action No. _____ |

## COMPLAINT

COMES NOW the Plaintiff, Easoon USA, LLC (hereafter the "Plaintiff"), by and through the undersigned counsel, and files this Complaint against the Defendants, Brett Kelly ("Kelly"), Mark Clifton ("Clifton") and David S. Osterman, a/k/a Steve Osterman ("Osterman") and shows this Court as follows:

### Parties

**1.** Plaintiff Easoon USA, LLC ("Easoon") is a Georgia limited liability company and submits itself to the jurisdiction and venue of this Court by filing the instant Complaint against Defendant.

**2.**     Defendant Brett Kelly is a resident of the State of Pennsylvania and may be served with process at 43 Iroquois Ct., Chesterbrook, Pennsylvania 19087.

**3.**     Defendant Mark Clifton is a resident of the State of Maryland and may be served with process at 610 Dunsinnan Trail, Bel Air, Maryland 21014.

**4.**     Defendant David S. Osterman, a/k/a Steve Osterman, is a resident of the State of Oregon and may be served with process at 8816 SW Ash Meadows Rd., Suite 1216, Wilsonville, Oregon 97070.

### Jurisdiction and Venue

**5.**     This Court has jurisdiction over this action pursuant to Georgia's Long-Arm Statute, O.C.G.A. §§ 9-10-91 and 9-10-93, as the actions of the Defendants were directed to harm and, in fact, caused harm and injury to Plaintiff, a Georgia company headquartered in Atlanta, Georgia.

**6.**     This Court has subject matter jurisdiction over these parties based upon complete diversity of the Plaintiff and Defendants pursuant to 28 U.S.C. § 1332(a). Plaintiff is a Georgia limited liability company, wholly owned by a Hong Kong limited company, HK Easoon Wood Technology Co., Ltd., which is owned by two Chinese citizens residing in mainland China. The Defendants are residents of Pennsylvania, Maryland and Oregon. Plaintiff has been harmed in excess of at least $100,000.00, exceeding the statutory threshold of monetary damage of at least $75,000.00.

**7.** Jurisdiction and venue are proper before this Court.

## Factual Background

**8.** Plaintiff is a distributor, wholesaler and marketer of wood flooring and bamboo products and transacts business in the United States, Canada and Mexico under the brand and trade name Dasso, dasso Group, Dasso.XTR and Dasso USA, among other brand names.

**9.** In the United States, Canada and Mexico, Plaintiff has been granted the exclusive rights to market, sell and distribute bamboo products manufactured by Hangzhou Dasuo Technology Co. Ltd. ("HDT").

**10.** Dasso International, Inc. is the owner of U.S. Patent No. 8,709,578 ("Patent 578"), which is a fused bamboo fused bamboo decking product. Patent 578's Field of Invention states, "The invention generally relates to a bamboo scrimber and a manufacturing method thereof and more specifically to a bamboo scrimber including a plurality of pressure-pressed bamboo strips impregnated with an adhesive and modified through heat-treatment and a method of manufacturing such bamboo scrimber." [1]

**11.** At no time since April 18, 2008, has any person or entity, other than those working with or specifically authorized by Plaintiff, held or maintained any

---

[1] A copy of Patent 578 is attached hereto as <u>Exhibit A</u>.

rights to market, sell or distribute Patent 578 product in the United States, Canada and Mexico.

12.     Plaintiff has invested heavily in the United States, Canada and Mexico in marketing, selling and distributing Patent 578 product. Plaintiff has hired employees, established offices, leased and purchased warehouses, established a large customer base and has expended substantial funds to introduce, import, market and sell Patent 578 products in the U.S., Canada and Mexico territorial markets as the patent owner's exclusive and only authorized distributor of 578 Patent products in those countries.

### China Patent and Manufacturing using Patent 578

13.     Hangzhou New Bamboo Culture Innovations Co., Ltd. ("New Bamboo") holds the patent rights to Patent 578 in China and several other countries around the world. New Bamboo granted the rights to manufacture the 578 Process in China to HDT, who has contracted with factories in China to manufacture bamboo product using the 578 Patent. Once the 578 Patent product is manufactured by the factories, the factories return the 578 Patent product ("578 Product") to HDT, who then distributes the 578 Product to various approved and authorized licensees, wholesalers and distributors in countries around the world. As stated above, Plaintiff is the only authorized distributor of 578 Product in the United States, Canada and Mexico.

14.   As part of that manufacturing process, HDT contracted with Fujian Zhuanghe Bamboo Industrial Co. Ltd. ("Zhuanghe Factory"), a factory in China. Zhuanghe Factory is contractually required to manufacture the 578 Product and return the product to HDT for worldwide distribution. Zhuanghe Factory is a joint venture owned 51% by Liu Hongzhen and 49% by Fujian Yicheng Bamboo Products Co. Ltd. Fujian Bamboo Products Co. Ltd. is owned by a Mr. He Pincai ("Mr. He").

15.   Zhuanghe Factory has been manufacturing the 578 Product on behalf of HDT since 2015.

## MOSO International, BV – Bamboo X-treme

16.   MOSO North America, Inc. is a newly formed subsidiary of MOSO International BV ("MOSO BV"), which was formed with the Delaware Secretary of State on *June 7, 2017*.

17.   Similar to Plaintiff, MOSO BV has been marketing, selling and distributing the 578 Product under an exclusive distribution agreement with HDT since 2013. MOSO BV's distribution rights to the 578 Product are limited to the following countries and territories: Netherlands; Belgium; Luxembourg; United Kingdom; Ireland; Germany; Austria; Switzerland; Italy; Spain; Portugal; France; Denmark; Norway; Sweden; Finland; and Poland ("MOSO Territories").

18.   MOSO BV markets, distributes and sells the 578 Product under the brand name Bamboo X-Treme.

19.     The 578 Product is exclusively marketed, sold and distributed in the United States, Canada and Mexico by Plaintiff under the Dasso.XTR brand name. Conversely, the 578 Product is exclusively marketed, sold and distributed in the MOSO Territories by MOSO BV under the Bamboo X-Treme brand name. MOSO BV's Bamboo X-Treme and Plaintiff's Dasso.XTR are the same product, manufactured using the same 578 Patent process, manufactured at the same factories in China and, until recently, as set forth below, distributed solely and exclusively through HDT in China.

20.     Plaintiff and MOSO BV are competitors. HDT licenses and grants exclusive distribution rights in limited territories around the world to certain distributors and does not allow or authorize its distributors to enter markets and territories granted to other distributors.

21.     MOSO BV has never been granted the rights to import, market, sell and/or distribute the 578 Product in the United States, Canada or Mexico.

### Brett Kelly – Former President of Dasso.XTR

22.     On May 15, 2013, Brett Kelly ("Kelly") was appointed as Plaintiff's *President* of Plaintiff's Dasso.XTR division, which included the 578 Product. Kelly also became Plaintiff's Director of New Business Development in January, 2017.[2]

---

[2] A copy of Kelly's Offer Letter is attached hereto as Exhibit B.

23. Kelly's major responsibilities and duties as President of Plaintiff's Dasso.XTR division included sales of the 578 Product, establishing and managing inside and outside sales representatives of the Dasso.XTR brand, developing a network of bamboo and wood flooring dealers and installers in the U.S. to market, selling and installing the Dasso.XTR 578 Product, developing private label programs of the Dasso.XTR 578 Product in the U.S. and developing new business opportunities for Plaintiff and its Dasso.XTR division, which included the 578 Product.[3]

24. As President of Plaintiff's Dasso.XTR division of 578 Product, Kelly was intimately aware of, had numerous discussions concerning and was otherwise knowledgeable concerning Plaintiff's exclusive distribution rights of 578 Product granted by HDT in the markets consisting of the United States, Canada and Mexico.

25. As President of Plaintiff's Dasso.XTR division, which included the 578 Product, Kelly was intimately aware of, had numerous discussions concerning and was otherwise knowledgeable as to the MOSO Territories, which did not include the United States, Canada or Mexico.

26. As President of Plaintiff's Dasso.XTR division, which included the 578 Product, Kelly traveled on many occasions to China, met with the owners of HDT, visited manufacturing facilities, including the Zhuanghe Factory, met with the

---

[3] A copy of Kelly's LinkedIn profile is attached hereto as Exhibit C.

owners of the Zhuanghe Factory and otherwise had extensive knowledge of the 578 Patent, the 578 Product and Plaintiff's exclusivity to import, market, sell and distribute 578 Product in the U.S.

28. As shall be detailed below, Kelly resigned his position as President of Plaintiff's Dasso.XTR division on *June 11, 2017*.[4]

28. During the time that Kelly served as President of Plaintiff's Dasso.XTR division and Plaintiff's Director of New Business Development, Kelly had authority to enter into agreements with customers, suppliers and third parties in furtherance of Plaintiff's business operations.

**Mark Clifton – Former Vice President of Sales and Operations of Dasso.XTR**

29. Clifton was Plaintiff's former Vice President of Sales and Operations of Dasso.XTR, which included the 578 Product.[5]

30. Clifton began his duties as Plaintiff's Vice President of Sales and Operations of Plaintiff's Dasso.XTR division, which included the 578 Product, in or around December 2015.

31. Clifton was terminated as Plaintiff's Vice President of Sales and Operations of Plaintiff's Dasso.XTR division on June 19, 2017 due to Plaintiff's

---

[4] A copy of Kelly's Facebook Page is attached hereto as Exhibit D. Despite stating on his Facebook page that he resigned as President of Dasso.XTR and Plaintiff's Director of New Business Development on June 14, 2017, Kelly tendered his resignation letter on June 11, 2017.
[5] A copy of Mark Clifton's LinkedIn Page is attached hereto as Exhibit E.

concerns and confirmation of Clifton's involvement with Kelly, Osterman and MOSO BV, which shall be set forth below.

32.     During the time that Clifton held the office of Plaintiff's Vice President of Sales and Operations of Plaintiff's Dasso.XTR brand, Clifton had authority to enter into agreements with customers, suppliers and third parties in furtherance of Plaintiff's business operations.

### David S. Osterman, a/k/a Steve Osterman – Former West Coast Regional Manager of Dasso.XTR and Northwest Territory Manager of Dasso Group

33.     Osterman was Plaintiff's former Northwest Territory Manager of the Dasso Group and held the office of West Coast Regional Manager of Plaintiff's Dasso.XTR brand division, which included the 578 Product.[6]

34.     Osterman began his duties as Plaintiff's Northwest Territory Manager of the Dasso Group and as the West Coast Regional Manager of Plaintiff's Dasso.XTR brand division in February, 2013.

35.     Osterman abruptly resigned on June 19, 2017, once he became aware of Plaintiff's knowledge concerning his involvement with Kelly, Clifton and MOSO BV as shall be set forth below.

36.     During the time that Osterman served as Plaintiff's Northwest Territory Manager of Plaintiff's Dasso.XTR brand division and Plaintiff's West Coast

---

[6] A copy of Osterman's LinkedIn Page is attached hereto as Exhibit F.

Regional Manager of Plaintiff's Dasso.XTR brand division, Osterman had authority to enter into agreements with customers, suppliers and third parties in furtherance of Plaintiff's business operations

## Defendants' Conspire with MOSO BV
## While Still Managers and Officers of Plaintiff

37. *Prior to* Kelly resigning as President of Dasso.XTR and Director of New Business Development on June 11, 2017, and *prior to* Clifton being terminated as the Vice President of Sales and Operations of Dasso.XTR on June 19, 2017, and *prior to* Osterman resigning on June 19, 2017 as Plaintiff's Northwest Territory Manager and West Coast Regional Manager of Plaintiff's Dasso.XTR division, all three Defendants participated in discussions with MOSO BV and took actions in concert with MOSO BV to establish a MOSO BV subsidiary in the United States, to begin diverting Plaintiff's customers, to spread false rumors about Plaintiff to its customers, to knowingly infringe on Patent 578 and to assist MOSO BV in a plan to expand its distribution and sales outside of the MOSO Territories and into the U.S., Canada and Mexico markets without authority or consent.

38. On April 17, 2017, Kelly, ***using his Dasso.XTR email***, sent an email to Arjen Veltman, MOSO BV's Director of Sales, thanking Veltman for sending "leads", asking Veltman if he could use some of MOSO BV's videos and inquired whether Veltman could share some of MOSO BV's documents with him at that

time.[7] In response, Veltman informed Kelly, "Don't you think it is wise to wait until after the mr. He meeting before we make such plans? Once we start this, there is much more to do!"[8]

39.    At the time of the April 17, 2017 email exchange between Kelly, who, at the time, was Plaintiff's President of the Dasso.XTR division and Director of New Business Development, and Veltman, MOSO BV's Director of Sales, there were no joint collaborations between Plaintiff and MOSO BV, nor were there any meetings set up between Plaintiff and MOSO, BV, especially any meetings that involved Mr. He, the owner of the company that owns 49% of the Zhaunghe Factory.

40.    At the time of the April 17, 2017 email exchange between Kelly, who, at the time, was Plaintiff's President of the Dasso.XTR division and Director of New Business Development, and Veltman, MOSO BV's Director of Sales, and at all times, Plaintiff and MOSO BV have been and are competitors.

41.    From May 7, 2017 through May 12, 2017, Plaintiff organized and sponsored a factory visit and Dasso.XTR project trip to China for its customers (hereafter "China Trip"). Kelly attended on behalf of Plaintiff, along with Plaintiff's Managing Member, Avery Chua ("Chua").

---

[7] A copy of the April 17, 2017 email exchange is attached hereto as Exhibit G.
[8] As stated above, Mr. He is the owner of Fujian Yicheng Bamboo Products Co. Ltd., which owns 49% of the Zhuanghe factory that manufactures and produces the 578 Product on behalf of HDT.

**42.**     Plaintiff paid for all of Kelly's expenses to fly over to China on behalf of Plaintiff, where Kelly met with, interacted with and accompanied Plaintiff's customers to the Zhuanghe Factory and HDT headquarters.

**43.**     At the time of the China Trip, Kelly still held the position of Plaintiff's President of the Dasso.XTR division and Director of New Business Development. Plaintiff expended considerable funds on the China Trip on behalf of Plaintiff, its customers and Kelly, including airfare, hotels, travel, etc., and in furtherance of Plaintiff's efforts to expand its sales, customers and business opportunities of its Dasso.XTR brand under the direction of Kelly, its Dasso.XTR President.

**44.**     Plaintiff and Chua were later informed and learned that Kelly made an initial and intentional stop at MOSO BV's headquarters in the Netherlands on his way to China, and met with executives and leadership of MOSO BV. To cover his tracks, Kelly represented to Plaintiff that most of the flights to China were already booked and Kelly could only find a connecting flight through Europe. At the time Kelly made this statement to Chua, Plaintiff had no reason to believe that Kelly was actually meeting with a major competitor, MOSO BV, in Europe, on a trip that was being paid for by Plaintiff.

**45.**     MOSO BV is headquartered in Zwaag, Netherlands.

**46.**     On May 5, 2017, *two days before* the China Trip was to begin in China with Plaintiff, Kelly and Plaintiff's customers, Kelly extended birthday greetings to

a friend on his Facebook page.[9] As can be seen by the Facebook post on May 5, 2017, Kelly identified and designated his location on May 5, 2017 as being physically located in Zwaag, Netherlands.[10]

47.     Plaintiff would have never consented to, authorized or paid for Kelly to make an intentional stop at MOSO BV's headquarters in the Netherlands and meet with the leadership team and executives of MOSO BV, a competitor, and to conspire against Plaintiff and to cause Plaintiff harm and damage.

48.     There is no other explanation for Kelly being physically present in Zwaag, Netherlands, where MOSO BV is headquartered, two days before Kelly, Plaintiff, HDT and Plaintiff's customers were to meet in Hangzhou, China to visit the headquarters of HDT, tour the manufacturing factories, including the Zhuanghe Factory, and to further develop business, business opportunities and expand sales and revenue of Plaintiff's Dasso.XTR brand.

49.     Upon the conclusion of the May, 2017 China Trip with Plaintiff, Kelly and Plaintiff's customers, Kelly informed Plaintiff that he was staying a few extra days to go sightseeing.

50.     Instead of sightseeing as represented by Kelly to Plaintiff, Kelly participated in visits, meetings and/or calls with MOSO BV and representatives of

---

[9] A copy of the May 5, 2017 Facebook Post is attached hereto as Exhibit H.
[10] Id.

the Zhuanghe Factory, including Mr. He, the owner of the company that owns 49% of the Zhuanghe Factory that manufactures the 578 Product for HDT, and, most shockingly, ***personally met with the same customers of Plaintiff that had accompanied Plaintiff and Kelly during the China Trip***.

51.   On May 13, 2017, almost a month *prior to* resigning, and while still in China supposedly *sightseeing*, Kelly informed Plaintiff's customers that he would soon be resigning his position with Plaintiff as President of the Dasso.XTR division and Director of New Business Development, that he was ***partnering up*** with MOSO BV to sell the same product as the Dasso.XTR 578 Product, but under the MOSO Bamboo X-Treme brand, and that MOSO BV was entering the U.S. market and he would be heading up MOSO BV's new division in the U.S. market. Kelly further confirmed to several of Plaintiff's customers that he had flown to Europe on his way to China, personally met with the leadership and executives of MOSO BV and that ***everything had already been arranged*** for Kelly to head up MOSO BV's new subsidiary in the U.S.

52.   At the time Kelly was informing Plaintiff's customers at the end of the China Trip that he had finalized everything with MOSO BV to enter the U.S. market and compete against Plaintiff, despite the fact that all three Defendants still held executive and managerial positions with Plaintiff at the time and were being paid by Plaintiff on a bi-weekly basis, Plaintiff had no reason to believe that Kelly, Clifton

and Osterman were participating in, engaging in and taking actions against Plaintiff and Plaintiff's interests.

53. From May 31, 2017 to June 2, 2017, Kelly traveled to Toronto and met with one of Plaintiff's largest customers.[11] This customer was also in China with Plaintiff and Kelly during the China Trip and was one of the customers that Kelly discussed his departure as President of Dasso.XTR, that Kelly was going to head up MOSO BV's U.S. subsidiary and that it had already been arranged, and to whom Kelly falsely claimed that Plaintiff and HDT were in bankruptcy and would soon be out of business.

54. Upon information and belief, the purpose of Kelly's trip from New Jersey to Toronto between May 31, 2017 and June 2, 2017 was to convince one of Plaintiff's largest customers to no longer purchase Dasso.XTR product from Plaintiff and to begin purchasing MOSO BV's Bamboo X-Treme through Kelly once he resigned as President of Dasso.XTR and Plaintiff's Director of New Business Development.

55. On **June 11, 2017**, the President and Director of MOSO BV, Rene Zaal ("Zaal"), met with representatives of HDT in China, including Xu Jiang, CEO of HDT, Lin Hai, Policy and Technical Advisor of HDT, and Wang Jianmin, International Sales Director of HDT ("HDT Reps"). During the meeting, Zaal

---

[11] Copies of Kelly's Facebook posts of May 31, 2017 and June 2, 2017 are collectively attached hereto as <u>Exhibit I</u>.

informed the HDT Reps that, if HDT did not agree to allow MOSO BV to expand outside of the MOSO Territories and into the U.S., Canada and Mexico markets, MOSO BV would bypass HDT and buy directly from the Zhuanghe Factory. The HDT Reps informed Zaal that MOSO BV did not have any rights or authority to sell the 578 Product outside of the MOSO Territories and in the U.S., Canada and Mexico markets, that any unauthorized distribution of the 578 Product outside of the MOSO Territories would be in violation of several patents related to the 578 Patent, including in China and the U.S., and warned Zaal and MOSO BV not to infringe on Dasso International, Inc.'s 578 Patent or Plaintiff's exclusive distribution rights of 578 Product in the U.S., Canada and Mexico.

56.     Immediately following the meeting on June 11, 2017 between Zaal and the HDT Reps, Zaal informed Tony Wong, who drove Zaal back to his hotel in China after the meeting with the HDT Reps, that MOSO BV *already* had a sales team working for MOSO BV in the U.S., *and specifically named Kelly and Osterman as MOSO BV's sales team in the U.S.*, despite Kelly still holding the position of Plaintiff's President of the Dasso.XTR division and Director of New Business Development and Osterman holding the position of Plaintiff's Northwest Territory Manager and West Coast Regional Manager of Plaintiff's Dasso.XTR division.

57.     Shortly after the President of MOSO BV, Zaal, was dropped off at his hotel after being informed by the HDT Reps that it would not authorize MOSO BV's

distribution expansion into the U.S., Canada and Mexico of the 578 Product, Plaintiff received a resignation letter from Kelly on June 11, 2017, which was on the same day and shortly after MOSO BV's Zaal was dropped off at the hotel by Tony Wong.

58.     It appears that Zaal was correct when he informed Tony Wong that MOSO BV **already** had a sales team working for MOSO BV in the U.S., and specifically named Kelly and Osterman as MOSO BV's sales team in the U.S. According to the Delaware Secretary of State's website, MOSO North America, Inc. was incorporated on **June 7, 2017**, ***several days before*** Kelly resigned as Plaintiff's President of Dasso.XTR and the Director of New Business Development, ***and almost two (2) weeks prior*** to Osterman resigning as Plaintiff's Northwest Territory Manager and West Coast Regional Manager of Plaintiff's Dasso.XTR division and Clifton being terminated as the Vice President of Sales and Operations of Plaintiff's Dasso.XTR division based upon Plaintiff's discovery of Clifton's involvement with Kelly, Osterman and MOSO BV.[12]

59.     At the time that MOSO BV's new U.S. subsidiary, MOSO North America, Inc., was incorporated and registered in Delaware on June 7, 2017, all three Defendants still held executive and managerial positions with Plaintiff and were still being paid by Plaintiff for their services to Plaintiff in their respective executive and managerial positions with Plaintiff.

---

[12] A copy of the Entity Details from the Delaware Secretary of State is attached hereto as Exhibit J.

60.　On June 14, 2017, Kelly announced on his Facebook page that he "Left Job at Dasso USA" which he indicated began in "2013 in Atlanta, Georgia". Kelly's Facebook post on June 14, 2017 also states that Kelly "Started Working at MOSO Bamboo Products". He also states on his Facebook page that, "MOSO North America is a subsidiary of MOSO Bamboo Products."[13]

61.　*Just one day later*, on June 15, 2017, MOSO BV posted on its Facebook page, "MOSO Bamboo Products proudly accounces MOSO North America, Inc."[14] On June 18, 2017, Kelly shared MOSO BV's June 15, 2017 post on his own Facebook page.[15]

62.　Also on June 15, 2017, the Vice President of HDT, Steve Shen ("Shen"), visited the Zhuanghe Factory to meet with Mr. He to personally inquire as to whether the Zhuanghe Factory were in discussions to sell the 578 Product directly to MOSO BV in violation of the manufacturing agreement between the Zhuanghe Factory and HDT. Upon arrival, Shen saw the President of MOSO BV, Rene Zaal, who, clearly stunned to see Shen at the Zhuanghe Factory, quickly exited out the back in a car without speaking with Shen. The next day, Shen met Zaal at Zaal's hotel and, once again, MOSO BV was advised that buying directly from the Zhuanghe Factory and selling to MOSO BV for entry into the U.S. market without

---

[13] *See* Exhibit D.
[14] A copy of the June 15, 2017 Facebook post is attached hereto as Exhibit K.
[15] Id.

authority violated the 578 Patent, the manufacturing agreement between HDT and the Zhuanghe Factory and the exclusive distributorship agreement between HDT and Easoon. Once again, Zaal, on behalf of MOSO BV, advised Shen that MOSO BV had no choice but to enter the U.S. market in violation of Dasso's U.S. patent rights and Easoon's exclusive distribution rights of 578 Product in the U.S.

63.     On **June 19, 2017**, Steve Osterman, who was the West Coast and Northwest Regional Manager for Easoon, resigned his employment with Easoon and, according to his LinkedIn page, is now the Vice President of Sales of MOSO North America, Inc. A copy of Osterman's LinkedIn page is attached hereto as Exhibit 10.

64.     Shortly after resigning his position as Plaintiff's President of the Dasso.XTR division and Director of New Business Development on June 11, 2017 and announcing his employment with MOSO on June 14, 2017, Kelly again traveled to one of Plaintiff's largest customers in Toronto, and this time, Kelly was accompanied by Arjen Veltman, MOSO BV's Director of Sales, who was the same Director of MOSO BV that instructed Kelly on April 17, 2017, "Don't you think it is wise to wait until after the mr. He meeting before we make such plans? Once we start this, there is much more to do!"

**65.** On June 20, 2017, Kelly posted on his Facebook page, "The inaugural MOSO Bamboo Products North America has begun!"[16] As can be seen by the June 20, 2017 Facebook post, Kelly stated that he was traveling with Arjen Veltman, MOSO BV's Director of Sales and was traveling from New Jersey to Toronto, Canada.[17]

**66.** Plaintiff has since confirmed that Kelly and Veltman traveled to Toronto to pursue one of Plaintiff's largest customers, who was headquartered in Toronto (hereafter identified as the "Toronto Customer"). As stated above, the Toronto Customer was one of the customers that accompanied Plaintiff and Kelly on the China Trip and that Kelly met with at the end of the China Trip, where Kelly informed Plaintiff's customers that he was leaving his positions with Plaintiff as the President of Dasso.XTR and Plaintiff's Director of New Business Development and would be heading up MOSO BV's U.S. subsidiary. Lastly, the Toronto Customer is one of the customers that Kelly falsely informed that Plaintiff and HDT were in bankruptcy and were going out of business soon, a claim that is completely false and untrue.

---

[16] A copy of Kelly's June 20, 2017 Facebook post is attached hereto as Exhibit L.
[17] Id.

67. Kelly also posted on his Facebook page on June 20, 2017 that he was traveling from Toronto to Portland Oregon, which is where Osterman resides, as well as other customers of Plaintiff.[18]

68. In addition to Kelly, Arjen Veltman, MOSO BV's Director of Sales, accompanied Kelly to Portland, Oregon to meet with Plaintiff's customers. Plaintiff has since learned that Osterman, ***prior to his resignation*** as Plaintiff's Northwest Territory Manager and West Coast Regional Manager, set up meetings for Kelly and Arjen Veltman for the sole purpose of and in furtherance of Kelly, Osterman, Clifton and MOSO BV's scheme to steal customers of Plaintiff, using Kelly, Osterman and Clifton's executive and managerial positions with Plaintiff, including customer lists, pricing, contact information, etc.

69. On June 22, 2017, Kelly posted on his Facebook page, "The world wind is almost over. Thank you Steve Osterman your hospitality is always appreciated."[19]

70. At the same time that Kelly, Osterman, Clifton and Arjen Veltman, MOSO BV's Director of Sales, were on a "world wind" tour in pursuit of Plaintiff's customers, the owner of MOSO BV, Zaal, was meeting with one of the executives of HDT, Hai, in China on June 22, 2017. At that meeting, Zaal acknowledged that MOSO BV's distributorship agreement only allowed MOSO BV to sell the 578

---

[18] A copy of Kelly's June 20, 2017 Facebook page is attached hereto as <u>Exhibit M</u>.
[19] A copy of Kelly's June 22, 2017 Facebook post is attached hereto as <u>Exhibit N</u>.

Product under MOSO BV's Bamboo X-treme brand in the Territories, which did not include the U.S. Hai strongly expressed his displeasure with Zaal for MOSO BV setting up operations in the U.S. behind HDT's back and for stealing employees of Easoon. Zaal informed Hai that MOSO BV needed to expand its sales of the 578 Product because MOSO BV's investors were not happy with the growth of MOSO BV. Zaal informed Hai at this meeting that MOSO BV had no other choice but to focus on expanding to other markets, even if that meant violating its agreements, Plaintiff's agreements or any patent rights. Zaal informed Hai that MOSO BV was going to do what it had to do and it would live with the consequences at a later date if it came to that.

71. On June 26, 2017, Plaintiff began being notified and informed by customers that Kelly and Osterman were contacting Plaintiff's customers and telling them that Plaintiff, Dasso and HDT were "going out of business", in the process of shutting down operations and that Plaintiff's customers, instead of purchasing the Dasso.XTR product from Plaintiff, should begin purchasing the exact same product, except through MOSO's Bamboo X-treme brand.

72. On July 19, 2017, Plaintiff was informed by other customers that Kelly had told them that Plaintiff and HDT were in bankruptcy and the customers could order the same 578 Product for now on through MOSO under MOSO BV's Bamboo X-treme brand.

**73.** Despite the statements by Kelly and Osterman, Plaintiff and HDT have never filed bankruptcy and has never been at risk for filing for bankruptcy. The statements were clearly intended to mislead customers of Plaintiff, drive business away from Plaintiff and to MOSO BV, through its U.S. subsidiary, MOSO North America, Inc., while also acknowledging to customers that the product is the same 578 Product as Plaintiff's Dasso.XTR, but distributed under a different brand, MOSO's Bamboo X-treme.

**74.** Toward the end of September, first of October, 2017, Plaintiff and HDT learned that MOSO BV, through its subsidiary MOSO North America, Inc., which is being run and operated by Plaintiff's former officers and regional manager, Kelly, Clifton and Osterman, began importing 578 Product into the U.S. market beginning in August, 2017 under MOSO's Bamboo X-treme brand.

**75.** MOSO BV, including its U.S. subsidiary, MOSO North America, Inc., have never been granted distribution rights to sell the patented 578 Product in the U.S., Canada or Mexico.

**76.** Plaintiff remains the only authorized distributor of HDT's 578 Product in the U.S., Canada and Mexico.

**77.** As a result of the Defendants' intentional activities and conduct prior to their resignations and termination of executive level and managerial positions

with Plaintiff, Plaintiff has suffered the loss of customers, revenue, sales and profit, and has been damaged in an amount of at least $100,000.00.

78.     As a result of the Defendants' false statements made to third parties, including directly to Plaintiff's customers, Plaintiff has suffered harm and damage, resulting in a decrease of customers, revenue, sales and profit.

79.     Plaintiff has further suffered harm and damage as a result of paying the Defendants compensation as officers and a regional manager of Plaintiff's Dasso.XTR division, including reimbursing Defendants for travel and other expenses, at the same time the Defendants were engaging in a scheme and plan to divert business opportunities, customers and sales to a soon-to-be formed subsidiary of MOSO BV in the U.S.

80.     Plaintiff has been harmed as a result of the actions of Defendants in an amount to be proven at trial, but that is no less than $100,000.00.

## COUNT I – BREACH OF FIDUCIARY DUTY
### (All Defendants)

81.     Plaintiff restates and incorporates by reference Paragraphs 1 through 80 of the Complaint, as though the same were fully stated herein.

82.     On May 15, 2013, Kelly was retained by Plaintiff as President of Plaintiff's Dasso.XTR division, which included the 578 Product. Kelly was also appointed as Plaintiff's Director of New Business Development in January, 2017.

**83.** Kelly's major responsibilities and duties as President of Plaintiff's Dasso.XTR division included sales of the 578 Product, establishing and managing inside and outside sales representatives of the Dasso.XTR brand, developing a network of bamboo and wood flooring dealers and installers in the U.S. to market, selling and installing the Dasso.XTR 578 Product, developing private label programs of the Dasso.XTR 578 Product in the U.S. and developing new business opportunities for Plaintiff and its Dasso.XTR division, which included the 578 Product.

**84.** As President of Plaintiff's Dasso.XTR division of 578 Product, Kelly was intimately aware of, had numerous discussions concerning and was otherwise knowledgeable concerning Plaintiff's exclusive distribution rights of 578 Product granted by HDT in the markets consisting of the United States, Canada and Mexico.

**85.** As President of Plaintiff's Dasso.XTR division, which included the 578 Product, Kelly was intimately aware of, had numerous discussions concerning and was otherwise knowledgeable as to the MOSO Territories, which did not include the United States, Canada or Mexico.

**86.** As President of Plaintiff's Dasso.XTR division, which included the 578 Product, Kelly traveled on many occasions to China, met with the owners of HDT, visited manufacturing facilities, including the Zhuanghe Factory, met with the owners of the Zhuanghe Factory and otherwise had extensive knowledge of the 578

Patent, the 578 Product and Plaintiff's exclusivity to import, market, sell and distribute 578 Product in the U.S.

**87.**   Clifton was Plaintiff's former Vice President of Sales and Operations of Plaintiff's Dasso.XTR brand, which included the 578 Product.

**88.**   Clifton began his duties as Plaintiff's Vice President of Sales and Operations of Plaintiff's Dasso.XTR division in or around December 2015.

**89.**   Osterman was Plaintiff's former Northwest Territory Manager of the Dasso Group and held the office of West Coast Regional Manager of Plaintiff's Dasso.XTR, which included the 578 Product.

**90.**   Osterman began his duties as Plaintiff's Northwest Territory Manager of the Dasso Group and as the West Coast Regional Manager of Plaintiff's Dasso.XTR division in February, 2013.

**91.**   On June 11, 2017, Kelly resigned his position as President of Plaintiff's Dasso.XTR division and also resigned as Plaintiff's Director of New Business Development.

**92.**   On June 19, 2017, Clifton was terminated as Plaintiff's Vice President of Sales and Operations of Plaintiff's Dasso.XTR brand division, due to Plaintiff's concerns and confirmation of Clifton's involvement with Kelly, Osterman and MOSO BV to divert business opportunities, revenue and customers away from Plaintiff and toward a soon-to-be new subsidiary of MOSO BV in the U.S.

93.     On June 19, 2017, one day before Kelly and Arjen Veltman, MOSO

BV's Director of Sales, traveled to Portland, Oregon to attend meetings with

Plaintiff's customers that had been set up by Osterman and Kelly, Osterman abruptly

resigned.

94.     Plaintiff has learned that all three Defendants, while still holding

executive and managerial positions with Plaintiff, and while receiving compensation

and reimbursements from Plaintiff, were secretly planning, conspiring and had

aligned themselves with a competitor, MOSO BV.

95.     During the time that Defendants held executive and managerial level

positions with Plaintiff, and were being compensated by Plaintiff, all three

Defendants owed Plaintiff a fiduciary duty to protect and further the interests of

Plaintiff.

96.     As set forth above in great detail, it is abundantly clear that Defendants

violated their duties as fiduciaries to Plaintiff.

97.     As a result of the Defendants' breach of their fiduciary duties, Plaintiff

was harmed and is still being harmed as a result therefrom.

## COUNT II – BREACH OF DUTY OF LOYALTY
### (All Defendants)

98.     Plaintiff restates and incorporates by reference Paragraphs 1 through 97

of the Complaint, as though the same were fully stated herein.

99. Plaintiff has learned that all three Defendants, while still holding executive and managerial positions with Plaintiff, and while receiving compensation and reimbursements from Plaintiff, were secretly planning, conspiring and had aligned themselves with a competitor, MOSO BV.

100. The Defendants' actions, while still holding executive and managerial positions with Plaintiff, and while receiving compensation and reimbursements from Plaintiff, violated a duty of loyalty each Defendant had to Plaintiff, who was paying and reimbursing each Defendant as officers and managers of Plaintiff's Dasso.XTR division.

101. The Defendants' actions, while still holding executive and managerial positions with Plaintiff, and while receiving compensation and reimbursements from Plaintiff, were undertaken by Defendants out of greed and to enrich themselves and one of Plaintiff's competitors, MOSO BV, through a newly formed subsidiary, MOSO North America, Inc.

102. Most egregious were the actions of Kelly, the President of Plaintiff's Dasso.XTR division, who misled, lied and deceived Plaintiff by taking trips to customers to solicit and divert Plaintiff's customers to MOSO BV, at the expense of Plaintiff, and even lied to Plaintiff and deliberately scheduled a layover in the Netherlands to meet with Plaintiff's competitor on his way to a Plaintiff paid and sponsored customer retreat in China. Kelly further lied to Plaintiff about sightseeing

in China after the China Trip, when he was really meeting with and participating in meetings and calls with Plaintiff's customers, MOSO BV executives and the Zhuanghe Factory in furtherance of the Defendants' conspiracy to use their positions as executives and managers of Plaintiff's Dasso.XTR division to steal customers, business opportunities and revenues from Plaintiff.

103. Plaintiff has been harmed as a result of Defendants' breach of their duty of loyalty to Plaintiff while they were executives and managers of Plaintiff's Dasso.XTR brand division.

## COUNT III – VIOLATION OF THE UNIFORM DECEPTIVE TRADE PRACTICES ACT O.C.G.A § 10-1-372(a)(8)
### (All Defendants)

104. Plaintiff restates and incorporates by reference Paragraphs 1 through 103 of the Complaint, as though the same were fully stated herein.

105. Pursuant to O.C.G.A. § 10-1-372(a)(8), a person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he, "Disparages the goods, services, or business of another by false or misleading representation of fact."

106. The Defendants, in an effort to steal and divert Plaintiff's customers, have communicated falsehoods to third parties, primarily Plaintiff's now-former customers, current customers and prospective customers, by claiming that Plaintiff

and HDT are in bankruptcy, are in financial distress and will soon be closing down business operations.

107. Defendants, most specifically Kelly, began making these statements to third parties back when they/he were still executives and managers of Plaintiff's Dasso.XTR division.

108. At the time and at all times Defendants communicated those statements to third parties, Defendants knew the statements were false.

109. Third parties have relied on those misrepresentations and statements by Defendants by no longer doing business with Plaintiff out of concern for Plaintiff's financial viability and/or by moving their business and purchases from Plaintiff to MOSO BV, either directly or through its U.S. subsidiary, MOSO North America, Inc.

110. Plaintiff has been harmed as a result of Defendants' false and misleading statements, which violates the Uniform Deceptive Trade Practices Act.

## COUNT IV – MISAPPROPRIATION OF TRADE SECRETS
### (All Defendants)

111. Plaintiff restates and incorporates by reference Paragraphs 1 through 110 of the Complaint, as though the same were fully stated herein.

112. *Prior to* Kelly resigning as President of Dasso.XTR and Director of New Business Development on June 11, 2017, and *prior to* Clifton being terminated as the Vice President of Sales and Operations of Dasso.XTR on June 19, 2017, and

*prior to* Osterman resigning on June 19, 2017 as Plaintiff's Northwest Territory Manager and West Coast Regional Manager of Plaintiff's Dasso.XTR division, all three Defendants had access to and were provided with Plaintiff's internal and proprietary information, primarily customer lists, pricing information and costs related to shipping, importing, purchasing and distributing product in the U.S., Canada and Mexico markets.

113.    Prior to their departure, Defendants conspired with MOSO BV to steal customers from Plaintiff, began calling on customers of Plaintiff, disclosed the names and contact information of customers to MOSO BV, used customer lists to set up meetings with Plaintiff's customers on behalf of MOSO BV and otherwise transmitted and disclosed Plaintiff's proprietary information to MOSO BV in order to position themselves to run MOSO BV's subsidiary in the U.S.

114.    The misuse and abuse of Plaintiff's proprietary information, customer lists, pricing and data was unauthorized and constitutes a theft of Plaintiff's proprietary trade secrets.

115.    Plaintiff has been harmed as a result of Defendants' misappropriation of Plaintiff's trade secrets in an amount to be proven at trial.

## COUNT V –TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (All Defendants)

116.    Plaintiff restates and incorporates by reference Paragraphs 1 through 115 of the Complaint, as though the same were fully stated herein.

117. Defendants, through their deliberate actions, have spread falsehoods, untrue statements and communicated fictitious statements to third parties, including customers, as a means to interfere with and attempt to drive Plaintiff out of business.

118. On multiple occasions, Defendants have informed Plaintiff's customers, in an attempt to steal the customers from Plaintiff, that Plaintiff and HDT are in bankruptcy and soon closing its business operations.

119. The Defendants' actions have been malicious and a bad faith attempt to put themselves in a favorable position and profit from their falsehoods communicated to third parties.

120. Plaintiff has been harmed as a result of Defendants' malicious and intentional injury at the hands of Defendants.

## COUNT VI - FRAUD
### (Defendant Kelly)

121. Plaintiff restates and incorporates by reference Paragraphs 1 through 120 of the Complaint, as though the same were fully stated herein.

122. From May 7, 2017 through May 12, 2017, Plaintiff organized and sponsored a factory visit and Dasso.XTR project trip to China for its customers. Kelly attended on behalf of Plaintiff, along with Plaintiff's Managing Member, Chua.

**123.** Plaintiff paid for all of Kelly's expenses to fly over to China on behalf of Plaintiff, where Kelly met with, interacted with and accompanied Plaintiff's customers to the Zhuanghe Factory and HDT headquarters.

**124.** At the time of the China Trip, Kelly still held the position of Plaintiff's President of the Dasso.XTR division and Director of New Business Development. Plaintiff expended considerable funds on the China Trip on behalf of Plaintiff, its customers and Kelly, including airfare, hotels, travel, etc., and in furtherance of Plaintiff's efforts to expand its sales, customers and business opportunities of its Dasso.XTR brand under the direction of Kelly, its Dasso.XTR President.

**125.** Plaintiff and Chua were later informed and learned that Kelly made an initial and intentional stop at MOSO BV's headquarters in the Netherlands on his way to China, and met with executives and leadership of MOSO BV. To cover his tracks, Kelly represented to Plaintiff that most of the flights to China were already booked and Kelly could only find a connecting flight through Europe. At the time Kelly made this statement to Chua, Plaintiff had no reason to believe that Kelly was actually meeting with a major competitor, MOSO BV, in Europe, on a trip that was being paid for by Plaintiff.

**126.** MOSO BV is headquartered in Zwaag, Netherlands.

**127.** On May 5, 2017, *two days before* the China Trip was to begin in China with Plaintiff, Kelly and Plaintiff's customers, Kelly extended birthday greetings to

a friend on his Facebook page. Kelly identified and designated his location on May 5, 2017 as being physically located in Zwaag, Netherlands.

128. Plaintiff would have never consented to, authorized or paid for Kelly to make an intentional stop at MOSO BV's headquarters in the Netherlands and meet with the leadership team and executives of MOSO BV, a competitor, and to conspire against Plaintiff and to cause Plaintiff harm and damage.

129. There is no other explanation for Kelly being physically present in Zwaag, Netherlands, where MOSO BV is headquartered, two days before Kelly, Plaintiff, HDT and Plaintiff's customers were to meet in Hangzhou, China to visit the headquarters of HDT, tour the manufacturing factories, including the Zhuanghe Factory, and to further develop business, business opportunities and expand sales and revenue of Plaintiff's Dasso.XTR brand.

130. Upon the conclusion of the May, 2017 China Trip with Plaintiff, Kelly and Plaintiff's customers, Kelly informed Plaintiff that he was staying a few extra days to go sightseeing.

131. Plaintiff relied on Kelly's statement that he was remaining in China to go sightseeing.

132. At the time Kelly informed Plaintiff that he was remaining in China just to go sightseeing, Plaintiff had no reason to believe Kelly was doing anything other than sightseeing.

**133.** Instead of sightseeing as represented by Kelly to Plaintiff, Kelly participated in visits, meetings and/or calls with MOSO BV and representatives of the Zhuanghe Factory, and, most shockingly, ***personally met with the same customers of Plaintiff that had accompanied Plaintiff and Kelly during the China Trip***.

**134.** Plaintiff would have never agreed or would have disapproved of Kelly remaining in China several extra days had Kelly been truthful about his real purpose for staying in China, which was to continue plans to steal proprietary information and trade secrets from Plaintiff, to meet with and spread falsehoods to Plaintiff's customers, to inform Plaintiff's customers that he was leaving his position with as an officer of Plaintiff's Dasso.XTR division and would be heading up MOSO BV's new U.S. subsidiary, MOSO North America, Inc. and had Kelly informed Plaintiff that he was also meeting with executives of MOSO BV and the Zhuanghe Factory to prepare to steal customers and business from Plaintiff.

**135.** Kelly knew the real reason why he had a layover in the Netherlands on his way to the China Trip, and intentionally failed to disclose that reason to Plaintiff.

**136.** Kelly knew the real reason why he was staying behind in China after the China Trip and failed to disclose that reason to Plaintiff.

**137.** Knowing the foregoing, Kelly allowed Plaintiff to cover his expenses of the China Trip, which essentially was tantamount to Plaintiff paying for Kelly's

nefarious business practices and conspiring with MOSO BV to harm Plaintiff and its business operations.

**138.** Plaintiff has been harmed as a result of Kelly's fraudulent activities to the detriment of Plaintiff.

### COUNT VII – CIVIL CONSPIRACY
**(All Defendants)**

**139.** Plaintiff restates and incorporates by reference Paragraphs 1 through 138 of the Complaint, as though the same were fully stated herein.

**140.** *Prior to* Kelly resigning as President of Dasso.XTR and Director of New Business Development on June 11, 2017, and *prior to* Clifton being terminated as the Vice President of Sales and Operations of Dasso.XTR on June 19, 2017, and *prior to* Osterman resigning on June 19, 2017 as Plaintiff's Northwest Territory Manager and West Coast Regional Manager of Plaintiff's Dasso.XTR division, all three Defendants engaged in a nefarious and illicit conspiracy with MOSO BV, to assist MOSO BV in setting up a U.S. subsidiary outside of the MOSO Territories, to provide Plaintiff's customer names and contact information to MOSO BV, to set up meetings between MOSO BV and Plaintiff's customers, to disclose Plaintiff's proprietary information to MOSO BV and to plan, scheme, engage in and effectuate unfair competition with MOSO BV and to detriment of Plaintiff and Plaintiff's business operations.

**141.** The Defendants knew their actions were wrongful, which is why the Defendants, especially Kelly, engaged in their conspiracy in secret and even lied to Plaintiff or omitted from Plaintiff their business activities, meetings, travel and overall conspiracy and scheme to assist MOSO BV in setting up and establishing a competing company in the U.S.

**142.** The Defendants' actions were knowingly and intentional and the conspiracy by the Defendants and MOSO BV was undertaken by the Defendants to place themselves in better financial positions by heading up MOSO BV's subsidiary in the U.S., MOSO North America, Inc.

**143.** The civil conspiracy, undertaken by all three Defendants, subjects all Defendants to liability for the torts committed against Plaintiff.

**144.** Plaintiff has been harmed by the Defendants' conspiracy to cause financial destruction to Plaintiff.

## COUNT VIII – PUNITIVE DAMAGES – O.C.G.A. § 51-12-5.1(b)
### (All Defendants)

**145.** Plaintiff restates and incorporates by reference Paragraphs 1 through 144 of the Complaint, as though the same were fully stated herein.

**146.** The Defendants actions detailed above establish, by clear and convincing evidence, that their actions and conduct "showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."

**147.** Punitive damages should be awarded against the Defendants to punish the Defendants for engaging in such wrongful and bad faith business practices and to deter the Defendants from engaging in the same or similar conduct in the future against others.

## COUNT IX – ATTORNEY'S FEES – O.C.G.A. 13-6-11
### (All Defendants)

**148.** Plaintiff restates and incorporates by reference Paragraphs 1 through 147 of the Complaint, as though the same were fully stated herein.

**149.** Plaintiff is entitled to an award of his reasonable attorney's fees and costs for pursuing this action against the Defendants as the Defendants have acted in bad faith, have been stubbornly litigious, or have caused the Plaintiff unnecessary trouble and expense.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor as follows:

A. That process be issued and service be made on all Defendants;

B. That Plaintiff receive judgment in its favor on all counts of the Complaint as alleged;

C. That Defendants disgorge and remit all funds expended by Plaintiff on their behalf and while Defendants were engaging in unlawful and deceptive conduct against Plaintiff;

D. That punitive damages be awarded and assessed against Defendants for their unlawful and improper conduct as stated herein;

E. That Plaintiff be awarded all of their reasonable attorney's fees and costs;

F. That this Court award Plaintiff such other and further relief in law or equity as this Court deems just and proper.

## JURY DEMAND

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, request a trial by jury of any and all issues so triable.

This 17th day of November, 2017.

**MILLS & HOOPES, LLC**
Attorneys for Plaintiff


/s/ Scott R. Hoopes
Georgia Bar No.: 365710
scott@millshoopeslaw.com

1550 N. Brown Road
Suite 130
Lawrenceville, Georgia 30043
(770) 513-8111 Telephone
(770) 513-8150 Facsimile